**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

KIMBERLY RIX,

                              Plaintiffs,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                Defendant.

Civil Action No.:  14-5733 (PGS)

MEMORANDUM AND
ORDER

This is an action brought under Section 405(g) of the Social Security Act, as amended
(hereinafter referred to as the "Act"), 42 U.S.C.A. § 405(g) and § 1383(c)(3), to review a final
determination of the Commissioner of Social Security (hereinafter referred to as the
"Commissioner"), which denied Plaintiff, Kimberly Rix's, applications for a period of Disability
Insurance Benefits and Supplemental Security Income benefits.  Plaintiff alleges that she has
been disabled since January 1, 2008 due to disc herniations, bipolar disorder, depression and
post-traumatic stress disorder (R. 105).   The issue is whether there is substantial evidence to
support the Administrative Law Judge's finding that Plaintiff was not disabled within the
meaning of the Act from January 1, 2008 (alleged onset date) through February 22, 2013 (the
date of the ALJ decision).

I.

Plaintiff appeared and testified at a hearing before the ALJ.    Plaintiff's past work history
includes working part-time as an enumerator for the Census Bureau from April, 2010 until June,
2010 (about two to three days per week for two to five hours each day).   She left that job on her
own accord because she was having muscle spasms in her back and it was slowing her down and

1

she couldn't keep up with the rest of the work crew.  She also worked at the post office as a mail carrier.  She acknowledged that she was terminated for being "absent without leave;" but her absence came about because she could no longer carry the bag due to back pain from a car accident, and additionally because at some point she was hospitalized at Beth Israel Hospital for psychiatric reasons.

At the time of the hearing her medications included Celexa (since 2010 for depression), Abilifly for bipolar disorder (since 2012), Klonopin for anxiety (since 2011) and Trazodone at night to help her sleep.   She has been taking ibuprofen and some other over the counter pain relief for her back pain.  She described the severity of her back pain as a bad toothache and it radiates down her legs at times.  The pain occasionally limits her ability to walk, and she testified that she can walk about two blocks and can stand for about a half hour at a time.

As noted above, Plaintiff currently suffers from anxiety, post traumatic stress disorder, depression, and bipolar disorder.  Plaintiff testified that her post traumatic stress disorder is the result of severe trauma that causes her to feel inadequate, and it is debilitating and embarrassing. Because of her anxiety, she prefers solitary surroundings.  She testified that sees a therapist, Kathleen Waldron, a nurse practitioner, weekly.

Medical Reports for Back Pain

In April of 2008, Plaintiff treated with Rytis Valskys, M.D. of Midland Anesthesia and Pain Management.   Dr. Valskys diagnosed Plaintiff with 1) cervical whiplash injury; 2) cervical facet syndrome; 3) cervical musculature spasm; 4) lumbar radiculopathy, and 5) herniated nucleus pulposus, at L4-L5 and L5-Sl.  He recommended steroid injections.  On April 29, 2008 Plaintiff received a lumbar epidural injection at L5-S1 (R.  344). Dr. Valsky reported that

Plaintiff had very good pain relief after first lumbar epidural steroid injection, and scheduled her for bilateral three-level facet joint injections for her neck pain.

In July 2009, Plaintiff was seen by Damian Martino, M.D. and Edwin Gangemi, M.D. at Jersey Rehabilitation and Pain Management P.A. (R. 363). Plaintiff described her back pain as sharp and achy, and that lying flat helped the pain, and that prolonged standing made it worse. The physician's impression was lumbar spinal strain. The doctor recommended Flexeril 10 mg, and physical therapy.

Also in evidence are medical records of Dr. Haq, an internist, who treated Plaintiff for heel pain and stiffness, routine general medical examinations, obesity, complaints of depression, chest pain, urinary frequency and back pain. On June 3, 2011 Plaintiff treated with Dr. Haq for stiffness in the right ankle and foot for a few days which resulted in some difficulty in daily activities. She presented with normal cognitive function and had no anxiety, no depression. The plan of care was rest and ice, gentle stretching, and a NSAID. She was advised to continue on Celexa for her depression. On June 13, 2011, Plaintiff was seen by Dr. Haq for a routine examination. At the time, Plaintiff denied joint or back pain, muscle weakness, joint swelling or muscle cramps. She had no anxiety or depression. The plan of care was to do regular exercises and maintain a healthy weight. She was to follow up with the podiatrist for ankle pain and return for another routine visit in three months. On September 12, 2011, Plaintiff returned to Dr. Haq complaining of feeling tired due to snoring. She was described as morbidly obese. The plan of care was to go for a sleep apnea study, she was advised to lose weight and exercise. She was to continue her Celexa every day for her symptoms of depression. (R. 735). At a September 20, 2011 visit to Dr. Haq, Plaintiff complained of pain in her groin area and was advised to continue with Motrin. She had no anxiety, and no depression.

About nine months later (June 11, 2012) Dr. Haq completed a Physical Residual Functional Capacity Questionnaire.  In summary, Dr. Haq indicated that Plaintiff had symptoms of depression, back pain, and occasional epigastric pain. (R. 759). Dr. Haq opined that Plaintiff's psychological problems would constantly interfere with her ability to perform even simple work tasks. (R. 760). He also opined that Plaintiff could sit one hour and forty-five minutes at a time before needing to change position by standing for thirty minutes before needing to sit down, walk around, etc. (R. 760-61). According to Dr. Haq, Plaintiff could sit about two hours and stand/walk about two hours in an eight-hour workday. (R. 761). Plaintiff must walk every hour for about fifteen minutes. (R. 761). Plaintiff required a job that permits shifting positions at will from sitting, standing or walking. (R. 761). Plaintiff would need to take unscheduled breaks every two hours, for a total of twenty minutes. (R. 761). Plaintiff did not require an assistive device (R. 761). She could frequently lift less than ten pounds and occasionally lift twenty pounds. (R. 761-62). Plaintiff could frequently look down, turn her head right or left, look up, and hold her head in the static position (R. 762). She could rarely perform postural activities. (R. 762). She had no significant limitations with reaching, handling, or fingering. (R. 762). According to Dr. Haq, Plaintiff's impairments would likely produce good days and bad days, and she was likely to be absent from work more than four days a month. (R. 762).

Immediately prior to Dr. Haq's opinion, Plaintiff underwent a course of physical therapy (May, 2012) with good results.  The physical therapy discharge summary indicated that Plaintiff stated that her pain significantly improved since the start of therapy; that she was independently performing exercises at home and feeling much better.  (R. 1005).   It was noted that Plaintiff could walk a half of a mile with no limp and that she reported a 24-30 minute maximum ambulation tolerance.

4

Consultative Examination

      On May 19, 2011 Plaintiff was examined by Rashel Potashnik, M.D. for an orthopedic examination. At the time she complained of right ankle pain and pain radiating from her feet to the lower back and up to the neck.  She walked in the office leaning on one crutch.  Without the crutches she could walk a few steps with a marked limp. She independently stepped on the scale and supported herself without an assistive device. She independently could move on and off the exam table. She had difficulties assuming supine position complaining of pain. Examination of cervical spine revealed no tenderness and normal range of motion.  Lumbar spine exam revealed generalized tenderness.   With the exception of an ankle sprain, the exam was unremarkable and Plaintiff had normal range of motion and strength.    The impression was chronic lower back pain.  A lumbosacral spine x-ray revealed spina bifida, but was otherwise normal.

Mental Health Treatment

      The Plaintiff has suffered with mental health issues since 2009. Some of the facts underlying her condition are:

      1.      In 2009, Plaintiff was a victim of domestic violence when her boyfriend assaulted her. Plaintiff was hospitalized and referred to a women's shelter (R. 373-408);

      2.      When Plaintiff was between 5 and 12 years old, she was sexually abused by her uncle (R. 409-416);

      3.      Plaintiff has a family history of mental health impairments wherein her father was bipolar; and her brother had psychiatric issues with drug abuse (R. 409-416);

      4.      When Plaintiff was considering an abortion, she became more depressed (R. 441); and

5.      Plaintiff has intrusive thoughts of hurting herself when she learned of her cousin's death (R. 680).

As a result of the above, Plaintiff has had sporadic mental health treatment.  For example, in 2009, Plaintiff was examined by Trinitas Psychiatric Emergency Services and referred to a women's shelter.  At her screening interview, she denied suicidal ideation and substance abuse; and her GAF was rated as a 50[1].   Plaintiff had normal motor activity, speech, judgment and interview behavior, but she was depressed, anxious and had somatic complaints.  As a result of these complaints, it was noted that Ms. Rix needed treatment for her mood disorder, symptoms of anxiety as well as her family and interpersonal conflicts through individual, family and group therapy as well as medication monitoring.

About a year later, on September 28, 2010, Plaintiff was admitted at Somerset Medical Center for psychiatric treatment for about a week.  She was admitted because she was more depressed with paranoid ideation and passive suicidal ideation. She reported that over the previous year she had increased sadness, and lacked interest in daily activities.

At the time of her discharge on October 4, 2010, her diagnosis was major depression with psychotic features; post-traumatic stress disorder and her GAF was 45-55[2].  She was placed on close observation. Plaintiff was also placed on medications including Celexa and Risperdal, her

---

[1] The Global Assessment of Functioning (GAF) is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.  The GAF Scale between 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).

[2]  As noted previously, the GAF Scale between 41 - 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).  The GAF scale between 51-50 indicates moderate symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

mood improved, the suicidal ideation subsided, and psychotic symptoms abated. As such, she was not a danger to herself or others, and she was discharged with appropriate follow-up care.

Thereafter, on December, 2, 2010 through December 13, 2010, Plaintiff attended outpatient psychiatric treatment at Somerset Medical Center and was treated by Michael R. Dunleavy, MSW, LCSW, LCADC.  (R. 438). On December 2, 2010, Plaintiff was happy because she found a new place to live, and had been functioning well due to new stress management skills that she had adopted; but was concerned about pregnancy related issues. Thereafter, on December 8, 2010, Plaintiff appeared euthymic and was cooperative during the sessions. On her third and final day of treatment, Plaintiff sought help with depression and suicidal ideation (R. 699-R.716), and a partial care program was recommended to her.

After the December, 2010 sessions, Plaintiff's attendance at outpatient treatment has been inconsistent. In fact, Plaintiff did not return for treatment until February 8, 2011 (R. 716-720) and she was non-compliant with her medication.

From March, 2011 through October, 2012, Plaintiff's compliance with medication and therapy was inconsistent but she made slow progress. (R. 679). Over the course of treatment, Plaintiff's mood improved, she was less symptomatic, more active and was volunteering at her children's schools (R. 844).   In October, 2011, Plaintiff "graduated" to the outpatient medication clinic. (R. 885). A transfer summary indicated that Plaintiff was seen 2 days per week in partial care program and was inconsistent in attendance (R. 844).

Residual Functional Capacity Assessment

The Residual Functional Capacity Assessment review of October 25, 2011 signed by Ellen Gara, a medical consultant, indicated that Plaintiff's limitations were as follows: Plaintiff can occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of six hours in an eight hour workday (with a medically required hand-held device which is necessary for ambulation); sit (with normal breaks) for a total of six hours in a eight hour workday; push and/or pull (including operation of hand and/or foot controls), unlimited.

A Mental Residual Functional Capacity Assessment was also conducted on the same date. It found that Plaintiff had some understanding and memory limitations.  More specifically

(1)      she was found not to be significantly limited in her ability remember locations, work-like procedures,  and simple instructions;  but was moderately limited in her ability to understand and remember detailed instructions;

(2)      she was found to be moderately limited in her ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances.

(3)      she was found not to be significantly limited in her ability to sustain an ordinary routine without special supervision; nor in her ability to work in coordination with or in proximity to others without being distracted by  them or in her ability to make  simple work-related decisions.

In short, the state agency medical experts opined that Plaintiff could perform light work with postural limitations (R. 102-03, 128-29), and state agency psychological consultants opined that Plaintiff had the ability to sustain adequate concentration, persistence and pace for simple work, follow simple directions, respond to supervision and adequately adapt to workplace changes (R. 101, 131).

Mental Health Questionnaire

In contrast to the state agencies finding on Plaintiff's mental residual functional capacity assessment, on December 6, 2012, Kathleen Waldron, a nurse practitioner, completed a mental impairment questionnaire on which she indicated that Plaintiff had been treated since March 12, 2012 for bipolar II disorder and PTSD. (R. 808-11). Ms. Waldron indicated that Plaintiff is seen every one to two weeks for psychotherapy and at least every month for medication monitoring (R. 808). Ms. Waldron indicated that Plaintiff had a marked restriction in activities of daily living; including difficulties in maintaining social functioning; constant deficiencies of concentration, persistence and pace; and continued episodes of deterioration (R. 764-812).

Vocational Expert Testimony

On December 17, 2012, Jackie Wilson, a vocational expert appeared and testified before the ALJ.   The ALJ asked the vocational expert to assume a hypothetical individual with Plaintiff's vocational characteristics, who could perform light work, except the hypothetical individual is limited to the occasional use of ramps, stairs and ladders; occasional exposure to loud noises and vibration; she cannot perform any greater than simple routine tasks and decisions; and she cannot sustain any more than occasional interaction with co-workers, supervisors, and the public (R. 79-80). The vocational expert testified that the hypothetical

individual would be capable of performing the representative occupations of mail clerk and cleaner/housekeeper, comprising thousands of jobs in the national economy (R. 80).

The ALJ asked the vocational expert a second hypothetical question, assuming the prior hypothetical individual with the following limitations: limited to lifting ten pounds occasionally or frequently and alternating four hours of sitting and standing (R. 80). The vocational expert testified that the hypothetical individual would be capable of performing the representative occupations of addresser and document preparer (R. 81).

## II.

A claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2)(A); see *Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin*., 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); see 42 U.S.C. § 405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. See *Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability. 20 C.F.R. § 404.1520. First, the plaintiff

must establish that he or she is not currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a).  If the plaintiff is engaged in substantial gainful activity, the claim for disability benefits will be denied.  See *Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)).  In step two, he or she must establish that he suffers from a severe impairment.  20 C.F.R. § 404.1520(c).  If plaintiff fails to demonstrate a severe impairment, disability must be denied.

If the plaintiff suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment found in "Listing of Impairments" located in 20 C.F.R.  § 404, Subpart P, Appendix 1. *Id.*; *Burnett*, 220 F.3d at 118-20.  If it does, the plaintiff is automatically disabled.  20 C.F.R. § 404.1520(d).  But, the plaintiff will not be found disabled simply because he is unable to perform his previous work.  In determining whether the plaintiff's impairments meet or equal any of the listed impairments, an ALJ must identify relevant listed impairments, discuss the evidence, and explain his reasoning.  *Burnett*, 220 F.3d at 119-20.  A conclusory statement of this step of the analysis is inadequate and is "beyond meaningful judicial review."  *Id*. at 119.

If the plaintiff does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four and five.  *Plummer,* 186 F.3d at 428.  In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity to perform [his or] her past relevant work." *Id.*; see also *Sykes*, 228 F.3d at 263; 20 C.F.R.  § 404.1520(d).  This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's residual functional capacity (RFC); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based

on that comparison, determine whether the claimant is capable of performing the past relevant work.  *Burnett*, 220 F.3d at 120.

If the plaintiff cannot perform the past work, the analysis proceeds to step five.  In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform.  See 20 C.F.R.  § 404.1520(g).  In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education, and work experience.  20 C.F.R. § 404, subpt. P, app. 2.  However, when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone, because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels."  *Sykes*, 228 F.3d at 269-70.  Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation.  Id. at 270-71, 273-74; see also *Burnett*, 220 F.3d at 126 ("A step five analysis can be quite fact specific, involving more than simply applying the Grids, including testimony of a vocational expert.")   If this evidence establishes that there is work that the plaintiff can perform, then he is not disabled.  20 C.F.R. § 404.1520(g).

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record.  42 U.S.C. § 405(g). See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). *Doak*, 790 F.2d 26 at 28.  Substantial evidence has been defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla.  *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer,* 186 F.3d at 422.  Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9.

The reviewing court must view the evidence in its totality.  *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).   A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence B particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion. *Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); see also *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987).  Nevertheless, the district court's review is deferential to the ALJ's factual determinations.  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder").  A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360.  But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]' s decision is not supported by substantial evidence."  *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act, 42 U.S.C. § 401, et seq. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. See 20 CFR § 404.1529. Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. "A claimant's symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings were rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony.

III.

The ALJ's Opinion

The ALJ followed the five step sequential process for determining disability. At step 2 he determined that Plaintiff suffered from the following severe disorders: disorders of the back, obesity and depression (20 CFR 404.1520(c) and 416.920(c)); however, she does not suffer from an impairment or combination of impairments that equals any of the listings found in 20 CFR Part 404, Subpart P, Appendix 1.

For example, Listing 1.04 (disorders of the spine) requires a finding of herniated nucleus pulposis, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture" which results in the compromise of a nerve root or the spinal cord along with the requirements of A, B, or C of this listing. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." An impairment

14

that meets only some of the criteria for a listed impairment "no matter how severely does not qualify". *Id. Sullivan v.* Zebley, 493 U.S. 521, 531 (1990).   There was no evidence in the record to indicate that any such finding existed.   Although Plaintiff treated for cervical whiplash and back pain resulting from an accident in 2008, Dr. Valsky reported that Plaintiff had very good pain relief after first lumbar epidural steroid injection, and scheduled her for bilateral three-level facet joint injection for her neck pain.  (R. 344).  In addition, at a May 19, 2011 orthopedic examination with Rashel Potashnik, M.D., Dr. Potashnik found tenderness of the lumbar spine, but the x-ray of that same date revealed spina bifida, but was otherwise normal.  There is no evidence of record that Plaintiff's spina bifida is a disabling condition.

In addition, as noted above, a March 9, 2012 x-ray of the lumbar spine showed slight levoscoliosis. The Plaintiff's back complaints were treated conservatively with Motrin and a course of physical therapy in May, 2012 with good results. A physical therapy discharge summary indicated that the claimant stated that her pain significantly improved since the start of therapy; that she was independent with home exercises and feeling much better; and that she would not make any therapy appointments any more.  (R. 1005).

With regard to Plaintiff's depression, the ALJ found:

The severity of the claimant's mental impairment does not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. repeated episodes of decompensation, each of extended duration, means three episodes within l year, or an average of once every 4 months, each lasting for at least 2 weeks.

The ALJ found that although Plaintiff has moderate difficulties in daily functioning, specifically with regard to her post traumatic stress and bipolar disorder, she has only mild difficulties in her activities of daily living. For example, Plaintiff reported that she is able to take care of her children with help from her mother; maintains her personal care; prepares meals on a weekly basis; performs household chores such as washing dishes, vacuuming and doing the laundry; attending church services; shopping in stores; watching television; driving a car; attending therapy; and volunteering at her children's school.  In addition, at a March 12, 2012 therapy session at UCPC Behavior Healthcare, Plaintiff reported that she wanted to return to work with the help of therapy and medications. (R.  764)   As for episodes of decompensation which is discussed in the paragraph B criteria, the Plaintiff has experienced one to two episodes of decompensation, each of extended duration.  However, because she does not meet the criteria of at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied, and Plaintiff failed to follow her treatment plan.

The ALJ found while she did visit the emergency room on February 17, 2011 , she remained stable during the emergency room evaluation and did not require inpatient admission (Exhibits 6F, 9F).  During a June 7, 2011 follow up visit, the Plaintiff reportedly stopped taking her medication because she felt that her symptoms were due to stress, not depression; and during an August 18, 2011 follow up visit, the claimant related that she was non-compliant because she reportedly had "other things to do".

The ALJ found that Plaintiff is capable of performing light work as defined in 20 CFR 404.1567(b) and 416.967 (b) except the claimant is limited to the occasional use of ramps, stairs

and ladders; occasional exposure to loud noises and vibration; she cannot perform any greater

than simple routine tasks and decisions; and she cannot sustain any more than occasional

interaction with co-workers, supervisors and the public. In making his determination, the ALJ

found that Plaintiff is "a younger individual" (27 years old) on the alleged disability onset date,

has a high school education and is able to communicate in English (20 CFR 404.1563 and

416.963), and utilizing the  Medical-Vocational Rules (grids) as a framework, Plaintiff is "not

disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and

20 CFR Part 404, Subpart P, Appendix 2).

     The ALJ's decision is supported by substantial evidence.  The Plaintiff refutes same

based upon several arguments which are addressed below.

IV.

     Plaintiff's counsel raises five issues with the ALJ's decision.  They are:

     1.     The ALJ improperly evaluated the medical evidence by "failing to give proper

credence to the complaints of Ms. Rix concerning her herniated disc and other back pain;

     2.     The ALJ failed to properly assess Plaintiff's obesity;

     3.     The ALJ's finding that Plaintiff was not totally credible was in error;

     4.     The ALJ failed to give great weight to the opinion of Dr. Haq, a treating

physician; and

     5)     the ALJ misinterpreted responses from the vocational expert.

Each of the above issues is discussed below.

     <u>Issues 1 and 3: (failed to give proper credence to the complaints of Ms. Rix)</u>

     Within the ALJ's findings of fact, he determined that Plaintiff had three severe

impairments, including disorders of the back, obesity and depression, but that Plaintiff's

"statements concerning the intensity and persistence and limiting effect of these symptoms are not entirely credible." Thereafter, the ALJ finds that Plaintiff's claims were "far in excess of what could reasonably be expected from her activities of daily living, medical condition and objective medical evidence." (R. 29). The ALJ noted that Plaintiff cared for three minor children, volunteered at their activities, and in May 2012 Plaintiff reported significant improvement in her pain. Those facts support the ALJ's credibility determination as these demonstrate that the intensity, persistence and limiting effects of her symptoms do not appear to rise to the level to be totally disabling.

Under the regulations, the ALJ cannot find a claimant disabled based solely on subjective complaints of pain. 20 C.F.R. §§ 404.1528, 1529. Credibility determinations as to a Plaintiff's testimony regarding pain and other subjective complaints are for the ALJ to make. V*an Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). Where an ALJ's credibility findings are supported by substantial evidence, those findings will not be disturbed on appeal. *Hartranft v. Apfel*, 181 F.3d 358, 363 (3d Cir. 1999). In the case of *Hartranft*, the Third Circuit held, with respect to the evaluation of subjective allegations of pain, that:

> [o]nce an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. This requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.

Id. at 362. The ALJ followed the holding of *Hartranft*. 20 C.F.R. §§ 404.1529(c)(1)-(c)(4).

First, the ALJ properly considered Plaintiff's own statements. As noted by the ALJ, in May 2011, Plaintiff stated that she wanted to get a job (R. 26, 689), and she actively looked for employment (R. 29, 853). Second, the ALJ considered the nature of Plaintiff's treatment. 20

18

C.F.R. § 404.1529(c)(3)(v). As noted by the ALJ, there is very little evidence of any permanent disability due to Plaintiff's back and neck injuries (R. 28). The ALJ noted that Plaintiff received only two months of pain management treatment in 2008 (R. 344-45, 348-51) and there were no ongoing hospitalizations. On consultative examination in 2011, Plaintiff had normal range of motion in the cervical spine and bilateral upper and lower extremities, but a preserved range of motion in the right ankle with no evidence of strength and sensory deficits (R. 621). Plaintiff refused to flex her lumbar spine (R. 621). Plaintiff received a brief period of physical therapy, and in May 2012 she canceled some appointments because she was feeling much better. (R. 1005).

While Plaintiff had emergency room visits and one hospitalization for depression, Plaintiff was discharged in improved condition during each visit (R. 28, 395, 411, 679). Treatment records document continued noncompliance (R. 689-91, 717, 885-92, 913, 920-35, 941). When Plaintiff was compliant with treatment, she felt that the medications helped her and her anxiety was controlled (R. 441-42, 467, 844, 853). Impairments reasonably controllable by medication or treatment are not disabling. See 20 C.F.R. § 404.1530; *See also Brown v. Bowen*, 845 F.2d 1211, 1215 (3d Cir. 1988); *Salles v. Comm'r. of Soc. Sec.*, 226 F. App'x 140, 146 (3d Cir. 2007); *Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986).

In addition, the ALJ considered Plaintiff's extensive activities of daily living. 20 C.F.R. § 404.1529(c)(3)(i)). During the relevant period, Plaintiff cared for her three children, with some help from her family (R. 697-98). She maintained personal care; prepared meals on a weekly basis; performed household chores, washed dishes, vacuumed and laundered clothes; attended church services; shopped in stores; watched television; drove a car; and volunteered at her children's school (R. 290-97, 620, 625-26, 678-81).

Accordingly, the ALJ considered all of the evidence before concluding that Plaintiff's assertions concerning her impairments and their impact on her condition, were not fully credible (R. 24). Based on the foregoing, the ALJ reasonably determined that Plaintiff had the residual functional capacity to perform a range of light work.

Issue 2: The ALJ failed to properly assess Plaintiff's obesity

Plaintiff's counsel asserts that the ALJ referenced obesity only once in his opinion and makes no findings.  The ALJ concluded "I have fully considered obesity in the context of the overall record evidence in making this decision," but there is little else.  As such, Plaintiff's counsel posits that the ALJ failed to evaluate obesity per the policy interpretations.  SSR 02-01p. Despite the ruling, Plaintiff has the burden of proof to show the facts, and Plaintiff did not do so. Even the brief does not allege any facts regarding Plaintiff's obesity.  In fact, the record as a whole does not support the need for a comprehensive discussion about Plaintiff's obesity.   For example, Plaintiff's hearing testimony does not contain any reference to her obesity as an impairment or as an aggravating factor; and Dr. Haq indicated that he was treating Plaintiff for obesity, and advised her to walk for at least fifteen minutes a day.  There is no other mention of it as an impairment or any treatment for same.

Under the circumstances, Plaintiff's broad allegation of obesity as an impairment with no substantive support for its impact on Plaintiff's impairments is an insufficient reason to upset the ALJ"s decision. See, *Rutherford v. Bankhart*, 399 F. 3d 546, 533 (3d Cir. 2005).

Issue 4:        The ALJ failed to give great weight to the opinion of Dr. Haq

The ALJ discounted Dr. Haq's opinion because his findings in his residual functional capacity assessment were based objective complaints of Plaintiff and were not supported by evidence in his treatment records of Plaintiff.  As previously noted, the Plaintiff reported

significant improvement with physical therapy on May 31, 2012, just eleven days before Dr. Haq's report (Exhibit 20F). There is no medical evidence that showed a significant decline in the Plaintiff's condition since May 31, 2012 that supports such limitations.

As noted above, Dr. Haq treated Plaintiff between June and September, 2011 for routine office visits.    During that time period, Plaintiff treated with Dr. Haq for stiffness in the right ankle and foot for a few days which resulted in some difficulty in daily activities.  She presented with normal cognitive function and had no anxiety, no depression. The plan of care was rest and ice, gentle stretching, and a NSAID. She was advised to continue on Celexa for her depression. On June 13, 2011, Plaintiff was again seen by Dr. Haq for a routine examination.  Plaintiff denied joint or back pain, muscle weakness, joint swelling or muscle cramps.   She had no anxiety or depression.  The plan of care was to do regular exercises and maintain a healthy weight.  She was to follow up with the podiatrist for ankle pain and return for another routine visit in three months.  On September 12, 2011, Plaintiff returned to Dr. Haq complaining of feeling tired due to snoring. Dr. Haq described her as morbidly obese.  Dr. Haq prescribed a sleep apnea study, to lose weight and to exercise.  She was to continue her Celexa every day for her symptoms of depression. R. 735.  At a September 20, 2011 visit to Dr. Haq, Plaintiff complained of pain in her groin area and was advised to continue with Motrin.  She had no anxiety, and no depression.  Throughout the notes, it was noted that plaintiff had one epidural steroid injection in her spine for pain in 2007.

Instead, the ALJ gave greater weight to the findings of Dr. Potashnik, and the assessment of the state agency medical and psychological consultants who opined that Plaintiff could perform the simple tasks of light work with postural limitations (R. 29, 102-03, 128-29).

Issue 5:   <u>The ALJ misinterpreted responses from the vocational expert.</u>

The Plaintiff argues that the hypothetical articulated by the ALJ to the vocational expert was "fatally flawed" in that it did not "accurately portray the claimant's individual physical and mental limitations" in that it did not include Plaintiff's obesity.  This is covered within the analysis of issues one and three above.

The vocational expert's testimony is clearly set forth. The vocational expert's testimony clearly limits the Plaintiff's activities to occasional use of stairs and ladders, to simple routine jobs with limited interactions with co-workers and customers. In addition, Plaintiff is limited to lifting 10 pounds and is required to alternate between standing and sitting while working.  Based upon same, the vocational expert testified that Plaintiff could undertake several types of jobs such as a mail clerk or cleaner as well as her prior work as a census taker.  See, *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987).

In this case, substantial evidence supports the Commissioner's decision that Plaintiff is not disabled during the relevant time period. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). *Doak*, 790 F.2d 26 at 28.

ORDER

This matter having come before the Court on Plaintiff's appeal of the Commissioner of the Social Security Administration's final decision denying an application for Disability Insurance Benefits; and the Court having considered all submissions of the parties, and for the reasons set forth in the above memorandum;

IT IS on this 14th day of January, 2016

ORDERED that the final decision of the Commissioner of Social Security is affirmed. The case is closed.

<u>s/Peter G. Sheridan</u>
PETER G. SHERIDAN, U.S.D.J.

23